UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No. 5:21-cv-00014-D

| | |
|---|---|
| BETH TANNER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ROY COOPER, et al.,<br><br>Defendants. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

Defendants Damon Circosta, Stella Anderson, Jeff Carmon, III, Karen Brinson Bell, and Roy Cooper, Governor of the State of North Carolina, hereby respond to Plaintiff's Motion for a Temporary Restraining Order. [D.E. 8, 9].

## NATURE OF THE CASE

Plaintiffs' motion for a temporary restraining order seeks to have this Court engage in an analysis of state law to overturn a state agency decision administering an election for a state judicial seat. In the 2020 general election, the candidate who won a Wake County District Court seat was determined to be disqualified after the election, but prior to assuming office. The North Carolina State Board of Elections ("State Board") relied upon N.C.G.S. § 128-7.1 to find that the appropriate remedy was to declare the judicial seat vacant. The statute reads in full:

> If any person who has been elected to public office (i) dies or becomes disqualified for the office before qualifying for the office, or (ii) for any reason refuses to qualify for the office, the office shall be declared vacant. Unless otherwise provided by law, such vacancy shall be filled by appointment by the authority having the power to fill vacancies as prescribed by law.

N.C.G.S. § 128-7.1. This statute provides no discretion to reach a different conclusion.

Plaintiffs' legal theory hinges upon this Court finding that the statute above was erroneously applied, and instead a new election should be ordered pursuant to N.C.G.S. § 163-182.13(a). Section 163-182.13(a) reads:

> The State Board of Elections may order a new election, upon agreement of at least four of its members, in the case of any one or more of the following:
>
>> (1) Ineligible voters sufficient in number to change the outcome of the election were allowed to vote in the election, and it is not possible from examination of the official ballots to determine how those ineligible voters voted and to correct the totals.
>>
>> (2) Eligible voters sufficient in number to change the outcome of the election were improperly prevented from voting.
>>
>> (3) Other irregularities affected a sufficient number of votes to change the outcome of the election.
>>
>> (4) Irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness.

N.C.G.S.§ 163-182.13(a). Plaintiffs' Complaint argues for a new election pursuant to subsection (4). In contrast to section 128-71, this statute is discretionary in nature even if the State Board determined that irregularities occurred, and requires a supermajority vote of four out of five members to be implemented.

Before the State Board, Plaintiff Tanner argued that she, as the second-place finisher, should be declared the winner. The State Board disagreed and found that the vacancy statute cited above applied. Plaintiff Tanner declined to appeal the State Board's decision to the Superior Court of Wake County, as she was entitled to do. *See* N.C.G.S. § 163-182.14. She instead filed this federal action, along with two additional voters, seeking a new election, a remedy that she did not pursue in her state proceedings before the State Board.

In order to bring this dispute within the jurisdiction of this Court, Plaintiffs have framed their preferred interpretation of state statutes within the context of Due Process and Equal

Protection violations. Although Plaintiffs seek a new election[1] as the ultimate relief in the Complaint, in this motion for temporary restraining order, Plaintiffs' seek only to enjoin the Governor from filling the seat through appointment to allow time for this Court to determine the proper remedy.[2] [D.E. 9, p. 7].

Defendants urge the Court to deny this collateral attack upon the State Board's administrative process because this Court should not exercise subject matter jurisdiction over this state law matter, Plaintiffs are unlikely to succeed on the merits, Plaintiffs will not suffer irreparable harm, and the balance of the equities favor Defendants over Plaintiffs.

## STATEMENT OF THE FACTS

The facts do not appear to be in dispute. [D.E. 9, p. 2]. In the November 3, 2020 general election contest for District Judge[3] for District 10F, Seat 2, the candidate who received the majority of votes was Timothy Gunther. [D.E. 1-2, ¶ 1]. On the Thursday before the election, Joan Erwin, a voter in the district filed an election protest contending that Gunther was not a resident of the district. *Id.*, ¶ 2. The matter was heard by the Wake County Board of Elections at its meeting on November 18, 2020. Following an evidentiary hearing, the Wake Board of Elections found that Gunther did not reside in the district, could not be certified as a duly elected District Court Judge

---

[1] It is not clear if the remedy of ordering a new election is available to the Court as Plaintiff has chosen to sue only three of the five members of the State Board, whereas the statute in question requires four members to vote in favor of an order to conduct a new election. N.C.G.S. § 163-182.13(a).

[2] Plaintiffs' motion for a temporary restraining order appears to contain a typographical error in that it seeks to enjoin Numbered Memoranda [D.E. 8], whereas Plaintiffs' Memorandum of Law in support the motion expressly states that it seeks to enjoin the appointment process only. [D.E. 9, p. 7].

[3] Generally, District Courts have original general jurisdiction over civil matters with amounts in controversy below $25,000 (N.C.G.S. § 7A-243), domestic relations matters (*Id.* § 7A-244), and jurisdiction over matters such as infractions (*Id.* § 7A-253), municipal ordinance violations, and misdemeanors. Id., 7A-272(a).

3

of District 10F, and referred the matter to the North Carolina State Board of Elections ("State Board") for further action. [D.E. 1-4].

On December 18, 2020, the matter was heard by the State Board. [D.E. 1-2, p. 1]. Plaintiff, Beth Tanner, argued that the she should be declared the winner of the election because she was the only qualified candidate on the ballot. *Id.*, ¶ 5. Contrary to her arguments here, Tanner argued that ordering a new election pursuant to N.C.G.S. § 163-182.13 was not the appropriate resolution. [D.E. 1-3, pp. 4-5]. At the hearing, a new election as a potential resolution was never argued or discussed during the hearing. See the publicly available audio recording of the December 18, 2020 Meeting of the North Carolina State Board of Elections.[4] Two board members moved unsuccessfully to resolve the matter by finding that a vacancy existed, but that it should be filled by the local party executive committee pursuant to N.C.G.S. § 163-114. *Id.* at timestamp 31:27 to 36:00. The majority agreed that a vacancy existed, but found that N.C.G.S. § 128-7.1 was the appropriate remedy to follow because Gunther was disqualified after Election Day and before assuming office. *Id.* at 36:00 to 40:00 and [D.E. 1-2, ¶ 9, 11]. As a result, the State Board issued an Order declaring that the office will be vacant as of January 1, 2021 and notifying the Governor of the vacancy. *Id.*, p. 3.

Pursuant N.C.G.S. § 163-182.14, Plaintiffs were aggrieved parties with the right to appeal the State Board's decision and present their argument that the State Board misapplied state law to the Superior Court of Wake County within ten days. N.C.G.S. § 163-182.14. Instead, Plaintiffs

---

[4] The State Board Meeting of December 18, 2020 was recorded in full in audio and is publicly available at the following link: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2020-12-18/State%20Board%20Meeting%20(Dec.%2018%2C%202020)-20201218%201503-1.mp4. Counsel for Plaintiff presents his argument to the State Board from approximately 11:30 to 23:00. The State Board Member's discussions, motions, and findings can be heard from approximately 23:00 to 40:00.

4

filed this matter under 42 U.S.C. § 1983, alleging that their Due Process and Equal Protection rights were violated because the State Board misapplied state law.

## LEGAL STANDARD

The same standards that apply to preliminary injunctions apply to a motion for a temporary restraining order. *See e.g., U.S. Dep't of Labor v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir.2006). "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Plaintiffs have the burden to prove each factor. *Id*. Additionally, a plaintiff must show that success on the merits is likely regardless of whether the balance of hardships weighs in his favor. *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). This burden requires more than simply showing that "grave or serious questions are presented." *Id*. at 346-47.

## ARGUMENT

**I. THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THIS STATE LAW MATTER.**

**A. Defendants Are Entitled to Eleventh Amendment Immunity Under *Pennhurst*.**

The Eleventh Amendment bars suits brought against States in federal court. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *see also Alden v. Maine*, 527 U.S. 706, 727-28 (1999). The Eleventh Amendment shields States from such lawsuits because the States are not

5

"a person" within the meaning of Section 1983. *See Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (stating that the Eleventh Amendment bars suits brought against state officials if the "state is the real, substantial party in interest"). "Eleventh Amendment immunity also extends to state officials when they are merely the nominal defendants and the state is the real, substantial party in interest." *Booth v. Maryland*, 112 F.3d 139, 142 (4th Cir. 1997) (internal quotation marks and citations omitted).

Pursuant to the Supreme Court's ruling in *Pennhurst,* this Court should hold that the individual Defendants are entitled to Eleventh Amendment immunity as state officers acting in their official capacities alleged to have committed an error of state law. *Pennhurst* at 107-17, 124-25 (citing *Larson* v. *Domestic & Foreign Commerce Corp*., 337 U.S. 682, 690, 695 (1949) ("[A]t least insofar as injunctive relief is sought, an error of law by state officers acting in their official capacities will not suffice to override the sovereign immunity of the State where the relief effectively is against it.")). "Just because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293 (4th Cir. 2001) (quoting *Bell Atl. Md., Inc. v. MCI Worldcom, Inc.*, 240 F.3d 279, 294 (4th Cir. 2001)).

The core teaching of *Pennhurst* is that "federal courts lack[ ] jurisdiction to enjoin . . . state officials on the basis of . . . state law." *Pennhurst*, at 89, 124-25; *Bragg* at 293 ("[S]overeign immunity also bars a court's grant of any type of relief, whether retrospective or prospective, based upon a State official's violation of State law."). Indeed, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. 89, 106.

This straightforward rule counsels this Court from entering injunctive relief in response to the Plaintiffs' motion. Plaintiffs' Complaint and Memorandum of Law make it clear that they have no claim unless this Court finds that state officials misapplied state law. [D.E. 1, ¶¶8, 21-22, 29; D.E. 8, pp. 4-5]. While the claims themselves purport to arise under federal law, the resolution of the question of state law will be dispositive. *Pennhurst* cautions that this Court does not have jurisdiction to restrain state officials from taking action based on their authority under state law. Thus, any relief the Court might enter against the State Board or the Governor on this basis would "contravene[ ] the Eleventh Amendment." *Pennhurst*, 456 U.S. at 117; *see also id.* at 106 ("A federal court's grant of relief against state officials on the basis of state law . . . conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

Moreover, this is not a case where "federal claims often require federal courts 'to ascertain what' state law provides" without "compelling state officials to comply with it." *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985). Here, Plaintiffs are asking this Court to find that the State Board's decision violated state law and that decision violated Plaintiff's constitutional rights, and to order the Governor to refrain from exercising the appointment power granted to him under state law. This is the type of injunctive relief that runs afoul of *Pennhurst's* requirement that federal courts not instruct state officials how to interpret state law.

**B. This Court Should Decline to Exercise Jurisdiction Under the *Younger* Abstention Doctrine.**

Plaintiffs' claims seek to have this Court interfere with state proceedings in violation of the abstention doctrine outlined in *Younger v. Harris.* 401 U.S. 37 (1971). *Younger*, and its progeny, created a "strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Assn.*, 457 U.S. 423, 431 (1983). *Younger* abstention began with state criminal

7

proceedings, but was later expanded to civil enforcement proceedings and "civil proceedings involving orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *New Orleans Pub. Serv., Inc. v. Council of Orleans*, 491 U.S. 350, 368, 109 S. Ct. 2506, 2518 (1989).

This matter falls under the last category of an order in furtherance of the state's ability to perform their judicial functions. The State Board's hearing and decision was judicial in nature because it involved a factual presentation regarding the election, a finding that the winning candidate was disqualified, and it resulted in a decision based on existing state law. *Id.* at 369-71 (quoting *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908)); see also *Middlesex*, 457 U.S. at 433-34. In contrast, a legislative act is defined by its nature of looking to the future and changing existing conditions by making a new rule. *Id.*

The Supreme Court in *Middlesex* provided factors to help determine the appropriateness of abstention. 457 U.S. at 432. It is appropriate where "(1) there is an ongoing state judicial proceeding that began prior to substantial progress in the federal proceeding, (2) that proceeding implicates important, substantial, or vital state interests, and (3) there is an adequate opportunity to raise constitutional challenges within the framework of the state judicial process." *Golphin v. Thomas*, 855 F.3d 278, 285 (4th Cir. 2017) (citing *Middlesex* at 432). This matter meets each factor.

First, the State Board issued a final decision, and Plaintiffs' right to appeal that decision renders it an ongoing state judicial proceeding. When an Administrative Agency issues a final decision, and the aggrieved party voluntarily foregoes their right to appeal that decision to state court, the matter is still considered to be a pending state proceeding for *Younger* purposes even though it never reached a state court. *Beam v. Tatum*, 299 F. App'x 243, 246 (4th Cir. 2008) (citing

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.,* 477 U.S. 619, 629 (1986) (holding that *Younger* abstention is appropriate where "constitutional claims may be raised in state-court judicial review of the administrative proceeding"). Thus, "a defendant to a coercive state administrative proceeding must exhaust his state administrative *and judicial remedies* and may not bypass them in favor of a federal court proceeding in which he seeks effectively to annul the results of a state administrative body." *Beam,* 299 F. App'x at 246 (quoting *Moore v. City of Asheville,* 396 F.3d 385, 388 (4th Cir. 2005) (affirming the district court's decision to abstain under *Younger* even though the plaintiff was left without any remedy for challenging his citation because his appellate rights in state court had already expired.) (emphasis in original)(internal quotations omitted). The Third Circuit follows the same logic to *Younger* analysis. *O'Neill v. City of Phila.*, 32 F.3d 785, 790 (3d Cir. 1994) ("We have been given no reason why litigants in a state administrative proceeding should be permitted to forego state-court judicial review of the agency's decision in order to apply for relief in federal court.").

In *Beam*, the Plaintiff was informed of his right to appeal an administrative decision to the Wake County Superior Court pursuant to N.C.G.S. § 20-91.1. *Beam* at 247. The Plaintiff did not do so; instead, he filed suit in federal court raising constitutional claims under section 1983. *Id.* The Fourth Circuit found that *Younger* abstention was appropriate under those circumstances. *Id.* at 248. To find otherwise would permit all similarly situated litigants with the ability to forum shop rather than follow the review and appellate process outlined under state law.

Second, the proceedings relate to the North Carolina overseeing its elections and how best to resolve a state election for a state judiciary position. No reasonable argument can be made that this does not involve the most vital of state interests.

9

Third, Plaintiffs had the opportunity to raise the same constitutional challenges through the state judicial process. If Plaintiffs had utilized their appeal rights under N.C.G.S § 163-182.14(b), they could have brought this matter before the Superior Court of Wake County and presented all of the same arguments. *See Ohio Civil Rights Comm'n*, 477 U.S. at 629 ("[I]t is sufficient under *Middlesex, supra*, at 436, that constitutional claims may be raised in state-court judicial review of the administrative proceeding."). The North Carolina Superior Courts are courts of general jurisdiction and there is nothing in this statute that limits that jurisdiction or the arguments that can be made in these proceedings. N.C. Const. art. IV, § 12(3); and N.C.G.S § 163-182.14(b). Thus, it is appropriate for this the Court to abstain from deciding this matter pursuant to the *Younger* abstention doctrine.

This is particularly true in light of the application of *Younger* abstention in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), because Plaintiffs' argument requires this Court to "interpret state statutes in a way that raises federal constitutional questions." *Pennzoil* at 11-12 ("[A] constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time -- thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless.").

In *Pennzoil*, the Plaintiff chose not to present its constitutional claims to Texas courts, thus making it impossible to be certain how the governing Texas statutes and procedural rules impacted the federal claims. *Pennzoil* 481 U.S. at 11. The Supreme Court determined that when the "case was filed in federal court, it was entirely possible that the Texas courts would have resolved this case on state statutory or constitutional grounds, without reaching the federal constitutional questions Texaco raises in this case." *Id.* at 12. It concluded that *Younger* abstention in situations like this "offers the opportunity for narrowing constructions that might obviate the constitutional

10

problem and intelligently mediate federal constitutional concerns and state interests." *Id.* (quoting *Moore* v. *Sims*, 442 U.S. 415, 429-30 (1979)).

This is precisely the situation before this Court in this matter. Plaintiffs had the opportunity to present their arguments pursuant to N.C.G.S. § 163-182.14, which provides a direct route from the State Board to the Superior Court of Wake County. Plaintiffs could have presented their questions of statutory interpretation to a state court. Unlike *Pennzoil* where state court presented only a *possible* resolution, here, the resolution of state law statutory interpretation in state court is entirely dispositive to Plaintiffs' federal claims. If a state court determined the State Board properly interpreted state law to declare a vacancy, the Plaintiffs would be unable to present a state law question to this Court to support their allegations of constitutional violations. Conversely, if a state court determined that the State Board made the wrong decision, and a new election should have been ordered, the Plaintiffs would still be unable to bring suit in any forum because they would be unable to allege an injury. For reasons not known, Plaintiffs chose to bypass the state court that could entirely resolve these claims without invoking federal constitutional questions, in order to file in federal court. Thus, as in *Pennzoil*, this Court should abstain from exercising jurisdiction over this matter.

### C. This Court Should Decline to Exercise Jurisdiction Under the *Burford* Abstention Doctrine.

The *Burford* abstention doctrine applies to this case because adjudicating the claims would insert the Court into the State's administrative system of investigating and hearing claims of election improprieties—an administrative system that has an adequate review mechanism through North Carolina state courts. Under *Burford*, "when adequate state court review is available, a federal court sitting in equity should abstain from reviewing cases involving difficult questions of state law or a state's administration of its own regulatory schemes." *King v. Jefferies*, 402 F. Supp.

11

2d 624, 635 (M.D.N.C. 2005) (citing *Burford v. Sun Oil Co.,* 319 U.S. 315, 333-34, 63 S. Ct. 1098, 1107, 87 L. Ed. 1424 (1943); *Prentiss v. Allstate Ins. Co.,* 87 F. Supp. 2d 514, 517-18 (W.D.N.C. 1999)).  When the relief sought is equitable in nature, the Court may dismiss the case under the *Burford* doctrine, rather than issuing a stay of proceedings.  *Id.* at 635–36.  The Supreme Court summarized the requirements for abstention under *Burford* as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans*, 491 U.S. at 361 (quoting *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 814 (1976)) (internal quotations omitted).

As a threshold matter, the Court must determine whether adequate state court review is available for Plaintiff's claims.  *Id.*  North Carolina has enacted a comprehensive statutory scheme that provides adequate review because any "aggrieved party" has a "right to appeal the final decision" of the State Board to Superior Court of Wake County.  N.C.G.S. § 163-182.14(b).  An adverse decision in state superior court can be appealed as of right to the North Carolina Court of Appeals.  *See id.* § 7A-27(b)(1); *e.g.*, *Appeal of Judicial Review by Republican Candidates for Election in Clay Cty.*, 45 N.C. App. 556, 264 S.E.2d 338 (1980).  Further, the North Carolina Supreme Court may elect to hear appeals from the State Board's election decisions.  *See* N.C. Gen. Stat. § 7A-31; *e.g.*, *James v. Bartlett*, 359 N.C. 260, 265, 607 S.E.2d 638, 641 (2005).  Under certain limited circumstances, the North Carolina Supreme Court *must* review decisions by the Court of Appeals.  *See* N.C.G.S. § 7A-30.  Thus, adequate judicial review exists for decisions of the State Board.

12

Under *Burford*, after adequate judicial review has been established, the court turns to the second question of "whether either: 1) difficult questions of state law exist which affect policy problems of substantial public import; or 2) federal review would disrupt state efforts to establish a coherent policy in an area of public interest." *New Orleans,* 491 U.S. at 361. Here, it is Defendants' position that this is not a difficult question of state law. The statute relied upon unambiguously requires that when a winning candidate is disqualified after election, it results in a vacancy that is to be filled by appointment by the governor in consultation with the local bar association. N.C.G.S. § 128-7.1.

However, federal review would disrupt the State of North Carolina's efforts to establish a coherent policy for how to handle a disqualified elected candidate. North Carolina law mandates that the State Board declare an office vacant when a candidate is elected but disqualified before taking office under section 128-7.1. In contrast, the State Board is given the option to order a new election, in certain situations, and only if at least four of its five members agree. N.C.G.S. § 163-182.13(a). Not only is this a discretionary option for the State Board, it is one which the General Assembly deemed to be so drastic it elevated the question to require a super-majority of the board's members.

The four scenarios under which this may be invoked are:

(1) Ineligible voters sufficient in number to change the outcome of the election were allowed to vote in the election, and it is not possible from examination of the official ballots to determine how those ineligible voters voted and to correct the totals.

(2) Eligible voters sufficient in number to change the outcome of the election were improperly prevented from voting.

(3) Other irregularities affected a sufficient number of votes to change the outcome of the election.

4) Irregularities or improprieties occurred to such an extent that they taint the results of the entire election and cast doubt on its fairness.

13

*Id.* The first three scenarios, in which the improprieties or irregularities affected enough votes "to change the outcome of the election" are not relevant to this matter. *Id.* Arguably, the fourth scenario provides a broad enough description that it could be applied to this matter as Gunther's candidacy knowing he was not a resident of the district could be described as an impropriety that tainted the results. *Id.* § 163-182.13(a)(4). Nonetheless, the drastic choice to order a new election was still a decision the State Board was free to choose or not choose at their discretion, whereas, the statute relied upon gave the State Board no such discretion. Compare *Id.* and § 128-7.1.

Therefore, this suit invites a federal court to draw conclusions about the State Board's proper application of a state statute regarding a state election. This state law, and the alternative proposed by Plaintiffs, "affect policy problems of substantial public import"—namely, how to resolve an election that has not reached a functional conclusion. *Prentiss*, 87 F. Supp. 2d at 519. This case would "disrupt state efforts to establish a coherent policy in [this] area of public interest." *Id.* And due to Plaintiffs' choice not to seek review in state court, it would ask this Court to make determinations where the state courts had not been given a chance to review the state agency's application of state law. *See N.C. Life & Acc. & Health Ins. Guar. Ass'n v. Alcatel*, 876 F. Supp. 748, 753 (E.D.N.C.), *aff'd*, 72 F.3d 127 (4th Cir. 1995) (abstaining because neither the North Carolina Department of Insurance nor the state's courts had had an opportunity to interpret statutes at issue).

The Fourth Circuit has routinely applied *Burford* to situations, like this one, where federal claims are actually "state law in federal clothing." *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 721 (4th Cir. 1999) (citation omitted); *see Browning-Ferris v. Baltimore County,* 774 F.2d 77, 79–80 (4th Cir. 1985) (abstention appropriate where federal claims under § 1983 involved questions of state and local land-use policy); *Caleb Stowe Assocs. v. County of Albemarle,* 724 F.2d 1079,

1080 (4th Cir. 1984) (abstention appropriate where § 1983 claims depended on construction of state law). This is the case here as the federal claims alleged in the Complaint are effectively grounded in Plaintiff's disagreement with the State Board's application of state law. [D.E. 9, pp. 4-5]. In such cases, the Fourth Circuit has "consistently found" that *Burford* abstention is appropriate. *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 282 (4th Cir. 2008).

Thus, dismissal under *Burford* is appropriate, rather than a stay. *See King*, 402 F. Supp. 2d at 635–36.

## II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs' claims are not likely to succeed on the merits because the State Board properly applied state law, and even if it did not, Plaintiff has failed to sufficiently support either constitutional violation.

### A. Plaintiffs' Claims Cannot Succeed Because the State Board Applied the Correct Statute.

In resolving this matter, the State Board considered several statutes in order to determine the correct legal remedy under North Carolina law, and ultimately found that section 128-7.1 applies. The statute reads in relevant part: "If any person who has been elected to public office … becomes disqualified for the office before qualifying for the office … the office shall be declared vacant." N.C.G.S. § 128-7.1. North Carolina's principles of statutory construction support the State Board's decision.

"The principle goal of statutory construction is to accomplish the legislative intent." *DTH Media Corp. v. Folt*, 374 N.C. 292, 299, 841 S.E.2d 251, 257 (2020) (quoting *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001)). Any question of statutory interpretation "looks first to the plain meaning of the words of the statute itself." *Id.* at 300 (quoting *State v. Ward*, 364 N.C. 157, 160, 694 S.E.2d 729, 731 (2010)).

15

Here, the plain meaning of this statute argues strongly in favor of it being applicable to this factual scenario. A candidate to public office was elected in the November general election when Gunther received the majority of the votes. See N.C.G.S. § 163-182.15(d) ("[T]he individual[] having the highest number of votes for each office shall be declared elected to the office…"). After the election was complete, but before he was certified and sworn into office, an election protest was heard and Gunther was disqualified. The fact that a protest was made before the election, or that the candidate was ultimately found to be ineligible for the election, does not change the fact that the legal disqualification came after the election. As a result, the State Board properly found that "the office shall be declared vacant." *Id.*, § 128-7.1.

Plaintiffs' preferred reading of this statute requires the Court to agree that the opening provision, "any person who has been elected to public office . . ." was not met here where the winning candidate was later disqualified. [D.E. 9, p. 4-5]. Such a reading is directly contradicted by plain language of the statute itself, which anticipates that a person can be elected and also be disqualified after the election. If disqualification after the election results in a finding that the person was never elected, then the inclusion of "disqualification" is rendered superfluous. Thus, Plaintiffs' preferred reading violates the principle of statutory construction which requires that interpretations must give purpose and meaning to each word of the statute. *State v. Coffey*, 336 N.C. 412, 417-18, 444 S.E.2d 431, 434 (1994) ("[A] statute should not be interpreted in a manner which would render any of its words superfluous.").

The applicability of section 128-7.1 is enhanced by a review of the other options presented at the State Board hearing and by Plaintiffs before this Court. "When multiple statutes address a single matter or subject, they must be construed together, *in pari materia*, to determine the legislature's intent." *DTH Media Corp.*, 374 N.C. at 300 (quoting *Carter-Hubbard Publ'g Co.,*

16

*Inc. v. WRMC Hosp. Operating Corp.*, 178 N.C. App. 621, 624, 633 S.E.2d 682, 684 (2006), *aff'd*, 361 N.C. 233, 641 S.E.2d 301 (2007)).  Courts reviewing such related statutes, "should be guided by the rules of construction that statutes *in pari materia*, and all parts thereof, should be construed together and compared with each other. Such statutes should be reconciled with each other when possible." *Id.* (quoting *Empire Power Co. v. N.C. Dept. of E.H.N.R.*, 337 N.C. 569, 591, 447 S.E.2d 768, 781 (1994).  Three alternatives are present in the record.

First, before the State Board, Plaintiff Tanner argued that the votes for the winning candidate should be discounted entirely and Plaintiff Tanner should be declared the winner.  [D.E. 1-3, pp. 3-4].  There is no statutory support for this position and controlling cases reject it.  *People ex rel. Duncan v. Beach*, 294 N.C. 713, 718, 242 S.E.2d 796, 799 (1978).  Plaintiffs have since abandoned this argument, therefore it is not before this Court.  [D.E. 9, p. 2].

Second, at the State Board meeting, two members proposed finding that a vacancy had occurred but that the local party executive committee should appoint a replacement candidate who would then directly assume office without an election pursuant to N.C.G.S. § 163-114.  This statute could not be applicable because it contemplates a vacancy after nomination but prior to election day, and allows for the new candidate to stand in the general election, rather then being directly appointed to the public office.  *Id.* The State Board correctly voted down that motion on those grounds.

Third, Plaintiffs' new preferred option is a ruling that the State Board must order a new election pursuant to N.C.G.S. § 163-182.13(a).  As argued above in Part I-B, this statute is discretionary, permitting the State Board to both find that improprieties occurred and not order a new election.  *Id.*  In fact, ordering a new election requires a super-majority vote of four out of five

17

members of the State Board, thus demonstrating the legislative intent that it be deemed a drastic remedy only to be utilized with bi-partisan agreement. *Id.*

Construing and comparing these other options together demonstrates that the State Board correctly chose section 128-7.1 as the remedy to apply to the facts presented in this case. On its face, the plain language of section 128-7.1 finds direct application when disqualifications are found after the election has occurred, whereas section 163-182.13(a) serves the purpose of broadly catching any irregularities which have no express statutory remedy elsewhere. Thus, reading the statutes *in pari materia*, both together and comparatively, the only reasonable conclusion is that the State Board's application of section 128-7.1 was correct.

The State Board's interpretation is reinforced by North Carolina's rule of statutory interpretation that statutes addressing the specific situation at issue—here, candidate disqualification occurring after an election—control over statutes that address more general situations that may be broadly read to apply—here, whether irregularities taint the result of an election. *High Rock Lake Partners, LLC v. N.C. Dep't of Transp.*, 366 N.C. 315, 322, 735 S.E.2d 300, 305 (2012) ("This Court adheres to the long-standing principle that when two statutes arguably address the same issue, one in specific terms and the other generally, the specific statute controls.").

Finally, the decision by the State Board was made with supporting precedence from North Carolina case law. In *Spruill v. Bateman*, the winning candidate for Recorder's Court of Plymouth was found to be ineligible to hold the office because he was not a licensed attorney at law; a disqualifying impairment that existed prior to, but not brought to light until after, his election. *Spruill v. Bateman*, 162 N.C. 588, 589, 77 S.E. 768, 768 (1913). The losing candidate brought suit to have himself declared the winner, but the North Carolina Supreme Court, relying on state law

18

and secondary sources at the time, found that even if the winning candidate is disqualified, the votes for that candidate are not void, and the losing candidate cannot be declared the winner. *Id.* at 590. The Court concluded that when the winner of an election is found to be disqualified, the proper remedy is to find that it creates a vacancy to be filled in the manner prescribed by the act creating the court. *Id.* at 594.

More recently, in 1978, the North Carolina Supreme Court considered the issue again in *People ex rel. Duncan v. Beach*, 294 N.C. at 715-16. In that matter, after winning the election for District Court Judge in 1974, the winning candidate assumed office despite being over the age of 70; again, an impairment which existed prior to his election rendering him ineligible to hold the office. *Id.* at 716. This disqualification was apparently not immediately discovered and he held office until 1977 when he resigned after it was brought to light. *Id*. This created a vacancy which was filled by the Governor appointing a new Judge. *Id.*

The candidate who lost the 1974 election brought suit to oust the newly appointed Judge and have himself declared the winning candidate. *Id.* at 716-17. Similar to Plaintiffs' appeal here, he argued that it was "far more in keeping with the democratic process and with the general rule of law that the sole qualified candidate be declared elected pursuant to his receipt of a majority of the legal votes rather than the office to be declared vacant, leaving the selection of the public servant not to the people but to the executive. . . ." *Id.* The North Carolina Supreme Court rejected this argument finding that although the votes cast for an ineligible candidate do not entitle him to hold office, those votes are not void, but given effect in determining the result of the election with respect to other candidates. *Id.* at 718.

The Court further found that upon the resignation, there was no one legally entitled to hold office by virtue of election, nor was there an incumbent with the right to continue until a successor

was elected or appointed. *Id.* at 721. This created a legal as well as an actual vacancy that was to be filled by the Governor through his appointment power. *Id.*

These cases, while different in some respects to the case before this Court, do set a firm precedent that when a candidate is found to be disqualified after the candidate has won the election, even when that disqualification existed prior to the election, the appropriate resolution is to declare a vacancy to be filled in the manner prescribed by law. The fact that the candidate was always ineligible for the office won, did not render the entire election void nor did it result in a new election.

Therefore, principles of statutory construction and North Carolina case law both support the State Board's Order to declare the office vacant and direct that the vacancy be filled by appointment pursuant to state law. As a result, this Court need not consider the question of constitutional violations because without an erroneous application of state law, Plaintiffs' claims cannot proceed.

**B. Plaintiffs' Will Not Succeed on a Due Process Claim.**

Plaintiffs' first cause of action arises under the Due Process clause of the Fourteenth Amended of the Constitution. [D.E. 1, ¶¶ 21]. The only argument made by Plaintiffs in support is a citation to *Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981), for the proposition that the State Board impermissibly disenfranchised voters when it relied on section 128-7.1 to declare the office vacant. *Id.*; and [D.E. 9, pp. 4]. Plaintiffs' argument must fail for the reasons explained in the immediately preceding section above because Plaintiffs' reading of the statute is incorrect and violates the principles of statutory construction.

Additionally, *Duncan* is distinguished. *Duncan* involved an incumbent Justice of the Georgia Supreme Court who submitted his letter of resignation two weeks after he was elected and

before commencing his upcoming term. 657 F.2d at 693. After starting his new term and promptly resigning, Georgia officials moved swiftly to appoint a replacement three days after the resignation became effective. *Id.*

These actions by Georgia officials ran afoul of Due Process because they ignored the plain requirements of Georgia's special election statute that guaranteed a popular election to fill a vacancy:

> Whenever any primary or election shall fail to fill a particular nomination or office and such failure cannot be cured by a run-off primary or election, or whenever any person elected to public office shall die or withdraw prior to taking office, or whenever any person elected to public office shall fail validly to take that office, then the authority, with whom the candidates for such nomination or office filed their notice of candidacy, shall thereupon call a special primary or election to fill such position.

*Duncan*, 657 F.2d at 693 n.2 (quoting Ga. Code § 34-1514 in full). The Georgia statute, like North Carolina statute 128-7.1, addresses the situation where the winner of an election subsequently fails to qualify for the office. But unlike section 128-7.1, the Georgia statute expressly mandates that a special election be called to fill the position, whereas the North Carolina statute expressly mandates that a vacancy be declared to be filled by appointment. Compare Ga. Code § 34-1514 with N.C.G.S. § 128-7.1.

Thus, *Duncan* does not stand for the proposition that every time a state chooses to fill an empty judicial seat by appointment rather than election, it has violated the due process rights of voters. In fact, the *Duncan* court noted that in previous cases the Fifth Circuit "specifically recognized that states enjoy broad authority to dispense with the elective process and provide by law that judicial vacancies shall be filled by gubernatorial appointment rather than popular election." *Duncan* at 702 (citing *Holley v. Askew*, 583 F.2d 728 (5th Cir. 1978). Instead, *Duncan* held that the violation of clearly applicable state law that guarantees a popular election creates a

21

constitutional violation because it results in a "patent and fundamental unfairness in the electoral process." *Id.* at 703 (internal quotations omitted).

Thus, contrary to supporting Plaintiffs' arguments, *Duncan* supports the State Board's actions. The State Board did exactly what the *Duncan* court said that Georgia officials should have done: apply the vacancy statute as written. The Georgia law required the vacancy to be filled by a special election; North Carolina's law requires such a vacancy to be filled by appointment. As *Duncan* is not applicable to this matter and Plaintiffs have presented no other basis for their Due Process claim, they have failed to demonstrate any likelihood of success on the merits.

### C. Plaintiffs' Will Not Succeed on an Equal Protection Claim.

Plaintiffs' second cause arises under the Equal Protection clause of the Fourteenth Amendment. [D.E. 1, ¶26; D.E. 9, pp. 4-5]. Plaintiffs' claim that the State Board's decision resulted in an Equal Protection violation of the Plaintiff-voters' rights through (1) debasement or dilution of votes and (2) arbitrary or disparate treatment of voters. [D.E. 9, pp. 4-5]. In support of this claim, Plaintiffs sole citation is to this Court's recent decision in *Moore v. Circosta*, No. 5:20-cv-507, D.E. 47 at 13-14 (E.D.N.C. Oct. 3, 2020). Plaintiffs' theory is that the act which created the judicial seat at issue called for it to be filled by general election in November 2020, and by misapplying section 128-7.1, the State Board arbitrarily denied the right to vote to voters. [D.E. 9, p. 5].

As a threshold matter, Plaintiffs have misstated the standard for Equal Protection violations in the context of the Supreme Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000). In *Bush*, different counties in Florida were applying different standards, in a manual recount, for determining how voters intended to cast their votes for president, pursuant to a vague, standardless order of state court. *Bush*, 531 U.S. at 106–09. The Court held that the lack of "specific standards"

and "uniform rules" throughout the state failed to guarantee Florida voters "the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." *Id.* at 105–06. Similarly, in *Moore v. Circosta*, this Court was analyzing whether changes to the elections rules after absentee ballots had been distributed may have created disparities between those who had already voted and those yet to vote. No. 5:20-cv-507, D.E. 47 at 14-15 (E.D.N.C. Oct. 3, 2020). Here, Plaintiffs have made no argument that reflects the concerns that different voters are being treated differently in violation of Equal Protection.

Specifically, Plaintiffs' advanced no clear argument for why the State Board's decision could be considered to have diluted votes, other than the same argument that the statute was misapplied. This fails to adhere to the legal definition of vote dilution. "[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential'" of a particular group. *Miller v. Johnson*, 515 U.S. 900, 911 (1995); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964). In other words, a successful voter-dilution claim must prove that the State failed to afford the votes of one group of voters "the same weight as th[ose] of other voters." *Hadley v. Junior College Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 53 (1970). Plaintiffs offer no allegation whatsoever that the intent of the decision was to devalue the votes of one group of lawful voters over another, or that a devaluing occurred. Instead, all voters from all groups are treated the same through the State Board's decision applying North Carolina's vacancy law.

Similarly, the only argument advanced in support of arbitrary treatment of voters is that the State Board denied the right to vote based on its misapplication of state law. Again, this argument relies entirely on the assumption that the State Board's decision lacks any rationale. *See Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 681 (2012) (noting that what makes a decision

arbitrary is whether "the relationship of the classification to its goal" is "attenuated"); *Reynolds*, 377 U.S. at 557 (noting that the in the equal protection analysis, an arbitrary discrimination "reflects no policy" (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962))). In *Bush*, for example, there was no rationale for applying different standards for voter intent on ballots in different counties during the same recount. 531 U.S. at 106–09.

The State Board's interpretation of North Carolina law was correct. And even if one disagrees with that interpretation, the State Board's reasoned decision after a hearing and argument cannot be construed to be so baseless as to be arbitrary. The State Board considered the arguments of Plaintiff Tanner, the alternative remedies presented by board members, and followed the statute applicable to the facts before them. On that basis, Plaintiffs have not sufficiently presented an allegation that voters were treated arbitrarily.

For these reasons, Plaintiffs' claims for Equal Protection violations lack merit and cannot be the basis for injunctive relief.

## III. PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEY WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED.

The second factor of the *Winter* test requires that plaintiffs demonstrate they will suffer irreparable harm if an injunction is not issued. *Winter*, 555 U.S. at 20. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

Should this Court reach the determination that it should exercise jurisdiction over this matter, and that Plaintiffs are likely to succeed on the merits of their claims, then the question of whether Plaintiffs will suffer an irreparable harm would still not be met. The Plaintiffs' Complaint

24

seek the ultimate relief of a new election in which Plaintiff Tanner can stand as a candidate and the Plaintiff voters can cast votes. If no temporary restraining order is not entered, the vacancy will be filled by appointment through the normal process. Plaintiffs then extrapolate that if the position is filled, and they ultimately prevail resulting in a new election, they would be injured because an incumbent would appear on the ballot against Plaintiff Tanner. However, even if that person holds the seat Plaintiff Tanner seeks, Plaintiffs suffer no irreparable injury because it would not prevent Plaintiff Tanner from running in any such election, nor would it prevent the Plaintiff voters from voting. By contrast, if an injunction is entered, irreparable loss would be imposed on the people of Wake County who will have to go without a district court judge that otherwise would be available to hear their cases, until the case is ultimately resolved.

Plaintiffs' only argument to the contrary is a speculative and unsupported theory that the appointed incumbent would have an advantage in any court-ordered new election. As there is currently no incumbent, there is no way to know if that eventual appointee would run in any special election. Even assuming that person did file as a candidate, North Carolina law does not permit any notation appearing on the ballot that tells the voter which of the candidates is the incumbent. N.C.G.S. § 163-165.5(a)(3). The only distinguishing feature between candidates in the general election is their partisan affiliation, a feature that was present in the general election of 2020, and would be present for any subsequent election. *Id.*, § 163-165.5(a)(4). Thus, it would be entirely speculative to think that the incumbent would have an advantage in the race.

For these reasons, Plaintiffs have failed to show that it is "likely" that they will suffer irreparable harm absent a temporary restraining order. *Winter*, 555 U.S. at 22.

## IV. THE EQUITIES TO THE PARTIES AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNTION.

The final two *Winter* factors require Plaintiffs to demonstrate that the equities tip in their

favor and that an injunction is in the public interest. *Id.* at 20. In cases involving challenges to governmental action, courts typically consider the balance of the equities and the public interest factors together. *Taliaferro v. N.C. State Bd. of Elections*, No. 5:20-CV-411-BO, 2020 WL 5709252, at *3 (E.D.N.C. Sept. 24, 2020). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Here, Plaintiffs challenge the decision of a state administrative body applying state law regarding an election for a state judiciary seat. Plaintiffs did so after deliberately choosing to forgo an established process for judicial review of that decision in state court. Should this Court choose to enter an injunction in these circumstances, it would be imposing an irreparable injury upon the ability of the State Board to administer state elections under well-established state law.

Moreover, the General Assembly in creating this judicial seat, intended it to be filled by January 1, 2021. N.C. Session Law 2020-84, 2020 N. C. ALS 84, 2020 N.C. Ch. 84. Due to the disqualification of a candidate not before this Court, that position remains unfilled. The correct decision by the State Board to declare a vacancy not only complies with state law, it provides for a prompt appointment to the vacant position, whereas a special election would present a costly and time-consuming mechanism to fill the seat. Any further delay will result in delays in the administration of justice for District Court matters in Wake County.

Specifically, Judicial District 10-F currently has 130,506 registered voters and consists of 25 precincts. *See the Declaration of Karen Brinson Bell*, ¶6, attached hereto as **Exhibit A**. If a new election were ordered to take place, the earliest it could occur would be 71 days from the order requiring it. *Id.* at ¶7. The earliest that a winner could be certified is an additional 27 days after

that. *Id.* It is estimated that a special election for this seat would cost $636,585 for one early voting site, but if another is required, then it would be $699,686. *Id.* at ¶14. This cost would be borne by the Wake County Board of Elections, which has not been allocated for such an election. *Id.* at ¶15.

Administratively, it would require significant contributions from State and County Board staff, and the recruitment of pollworkers for polling locations. *Id.* at ¶¶ 9-12, 16. This has become an increasingly difficult issue due to the pandemic, which it appears would impact any special election. *Id.* The State and County Boards successfully carried out the November 2020 General Election, however, the number of COVID-19 cases, hospitalizations, and deaths have dramatically increased since November 3, 2020. *Id.* at ¶17. Successful mitigation efforts that must be employed include voting sites that can accommodate social distancing, safety and protective measures for staff and voters, and PPE supplies not limited to hand sanitizer, masks, face shields, gloves, cleaning supplies, and single use pens and marking devices. Grants covered the pandemic-related costs in 2020, but those funds were designated for the 2020 federal elections only. *Id.*

Thus, there is a significant cost in both manpower and funds, as well as a potential risk to staff, volunteers, and voters if a special election were the ultimate outcome of this litigation. Under such circumstances, the balance of equities and public interest tip in favor of the Defendants and against any injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order should be denied.

Respectfully submitted this the 20th day of January, 2020.

**JOSHUA H. STEIN**
**Attorney General**

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
E-mail: tsteed@ncdoj.gov
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6567
Facsimile: (919) 716-6761

*Attorneys for Defendants*
