# Exhibit A

| | |
|---|---|
| BETH TANNER, et al., | ) |
| Plaintiffs, | ) |
| | ) **DECLARATION OF** |
| v. | ) **KAREN BRINSON BELL** |
| ROY COOPER, et al., | ) |
| Defendants. | ) |

I, Karen Brinson Bell, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge:

1. I am over 18 years old. I am competent to give this affidavit, and have personal knowledge of the facts set forth in this affidavit. I have consulted with senior staff at the State Board in the preparation of this affidavit.

2. I serve as the Executive Director of the North Carolina State Board of Elections (the "State Board"). I became Executive Director of the State Board effective June 1, 2019. My statutory duties as Executive Director include staffing, administration, and execution of the State Board's decisions and orders. I am also the Chief State Elections Official for the State of North Carolina under the National Voter Registration Act of 1993 and N.C.G.S. § 163-27 (2019 Spec. Supp.). As Executive Director, I am responsible for the administration of elections in the State of North Carolina. The State Board has supervisory responsibilities for the 100 county boards of elections, and as Executive Director, I provide guidance to the directors of the county boards.

3. Prior to my employment as an Executive Director of the State Board, I spent a significant portion of my professional life working on a wide scope of issues related to election

administration, including in the State of North Carolina.

4. I served as an Election Administration Consultant for the Ranked Choice Voting Resource Center from October 2016 until May 2019. I worked part time for the Center from April 2016 to October 2016. Prior to that, I was employed as a Business Development Director/Project Management Director at EasyVote Solutions from April 2015 until September 2016, and as a Director of Elections for the Transylvania County Board of Elections from March 2011 until March 2015. I also worked for the State Board as a District Elections Technician from February 2006 until March 2011.

5. In North Carolina, county boards of elections administer elections in each county, including, among other things, providing for the distribution of voting systems, ballots, and pollbooks, training election officials, conducting absentee and in-person voting, and tabulation and canvassing of results. The State Board oversees the statewide administration of elections and also supports county boards in their preparation and proofing of ballots. The State Board and county boards also conduct audits after each election to detect problems such as equipment malfunction, counting errors, etc.

6. Judicial District 10-F is located wholly in Wake County. There are currently 130,506 registered voters and 26 precincts in Judicial District 10-F.

Timing of a New Election

7. If a new election were ordered to take place in Judicial District 10-F, Seat 2, the election could, at the earliest, take place approximately 71 days after the order requiring a new election. The earliest the candidate could be issued the certificate of election would be 27 days after the election. This estimated is based on the following breakdown:

8. Pursuant to N.C.G.S. 163-182.13(e)(1) and 163-114(a), the appropriate district

executive committee of the N.C. Democratic Party would meet to appoint the replacement nominee. The deadline should be a few weeks out from the order to allow time for the committee to identify possible candidates, notice their processes, and meet. I recommend this deadline no earlier than 14 days from the order requiring a new election.

9. Staff estimate that ballot preparation and proofing would take approximately seven days for a standalone new election. During this process, ballots are generated based on the candidates in the contest. State Board and county board staff proof the ballots for content and accuracy, including paper, electronic, and audio accessible formats. Once approved by the county and State Board staff, the ballots are printed by a commercial vendor and delivered to the county board of elections

10. Pursuant to N.C.G.S. 163-227.10(a), the State Board must begin mailing ballots 50 days prior to election day, unless the State Board authorizes a reduction to 45 days or there is "an appeal before the State Board or the courts not concluded, in which case the board shall provide the ballots as quickly as possible upon the conclusion of such an appeal." One-stop early voting would begin 20 days before the special election under N.C.G.S. 163-227.2(b), as amended by Session Law 2019-239.

11. Before in-person voting occurs, the State Board must work with county boards to load data onto physical media cards that are placed in voting tabulation machines, a process called "burning media." The media cards ensure that the tabulators anticipate the layout of ballots and properly attribute votes based on the ballot markings. The county boards must also conduct logic and accuracy testing to ensure that tabulation machines accurately read ballots and to correct any errors in coding. Burning media, preparing tabulators, and logic and accuracy testing would take approximately 14 days. After that process, the State board works with the

3

Case 5:21-cv-00014-D   Document 11-1   Filed 01/19/21   Page 4 of 7

county board to conduct a mock election, which takes one day, and generally affords two weeks thereafter to remedy any technical problems identified during the mock election. That two-week period could be reduced, but the State Board generally believes that the two-week period insures against risks associated with technical problems that may be identified in the mock election. Under the current deadlines for distributing absentee ballots, which falls roughly a month before early voting begins, these processes can be accommodated. The time required for these processes would only become relevant if the absentee deadline were shortened to less than what is required by N.C.G.S. 163-227.10(a).

12. County canvass would take place ten days after the election and state canvass would take place three weeks after election day. N.C.G.S. 163-182.5. Absent the filing of a protest or a demand for a recount, the certificate of election will be issued six days after state canvass. N.C.G.S. 163-182.15. These post-election processes add a total of 27 days after Election Day until the prevailing candidate could be sworn in.

## Cost of a New Election

13. I estimate that a standalone new election in Judicial District 10-F would be approximately $636,686 with one early voting site or $699,686 with two early voting sites. This estimate was provided by the Wake County Board of Elections director, who provided a detailed spreadsheet breaking down all estimated costs for a standalone election.

14. The estimate was calculated based on the following costs: overtime salaries; temporary staffing and Election Day pollworker pay; equipment rental; polling place supply transportation and delivery; equipment such as computers, scanners, monitors, printers, voting booths and voting equipment; computer supplies; training webinars; office supplies; fuel and mileage reimbursement; lodging during trainings; postage for mailings including mailing

absentee ballots; secure election file destruction; voting site rental and insurance; publication of legal notices; and various printing costs including ballot and election form printing.

15. The costs of elections are borne by the county board of elections conducting the election. The Wake County Board of Elections has not allocated funding to conduct a standalone new election.

Other Administrative Challenges

16. Assuming any new election was held as a standalone election, there are additional administrative challenges the Wake County Board of Elections would face. Chief among these challenges would be recruiting pollworkers and securing polling locations, along with the associated costs. Increasingly, county elections officials have found it necessary to spend more time recruiting early voting and election day poll workers, especially because of the risks posed by the pandemic to pollworkers, the statutorily mandated early voting hours weekdays from 8 a.m. to 7:30 p.m. during the 17-day early voting period, and technological advances in many counties now require that election workers be familiar with computers. Additionally, a large portion of precinct voting locations are housed in places of worship or in schools, with still others located in privately owned facilities. Identifying and securing appropriate precinct voting locations and one-stop early voting sites requires advance work by county board of elections staff and coordination with the State Board.

17. The timing of a new election may still fall during the pandemic. While we successfully mitigated risk of exposure to COVID-19 during the 2020 Presidential election, the number of COVID-19 cases, hospitalizations, and deaths have dramatically increased since November 3, 2020. Successful mitigation efforts that must be employed include voting sites that can accommodate social distancing, safety and protective measures for staff and voters, and PPE

supplies not limited to hand sanitizer, masks, face shields, gloves, cleaning supplies, and single use pens and marking devices. Grants covered the pandemic-related costs in 2020, but those funds were designated for the 2020 federal elections only.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 19th day of January, 2021

Karen Brinson Bell
Executive Director